ESTHER G. DE ST. LAURENT, Appellant, v. GEORGE A. SLATER, Respondent.

*Fraud — purchase of a lot incumbered by tax titles, by an attorney from a woman not his client, who acts under the advice of another attorney — when equity will disregard errors in the admission and exclusion of evidence.*

The responsibility of an attorney who purchases from a party, not his client, who acts under the advice of another attorney, lots the title to which is incumbered with tax sales, with the avowed purpose of freeing the title from such tax sales, and the effect and true purport of statements made by him in reference to the validity of the tax sales and the want of title in the vendor, considered.

The rule in chancery, reaffirmed by section 1003 of the Code of Civil Procedure, that a judgment in an equity action will not be reversed for errors in the admission or exclusion of evidence, if, disregarding or considering, as the case may be, such evidence, the remaining evidence sufficiently supports the judgment, still obtains and applies not only to equity suits in which issues of fact are tried by a jury, but to equity suits tried entirely by the court.

APPEAL by the plaintiff, Esther G. de St. Laurent, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Westchester on the 30th day of January, 1897, upon the decision of the court rendered after a trial at the Westchester Special Term.

*William P. Fiero*, for the appellant.

*Walter R. Beach*, for the respondent.

Judgment affirmed, with costs, on opinion of the Special Term.

All concurred.

The following is the opinion of the Special Term :
GAYNOR, J. :

I find that the plaintiff was not induced to make the conveyance in question by false and fraudulent representations by the defendant. She acquired title in fee to the two lots of land in Mount Vernon, N. Y. (Nos. 925 and 949), covered by the conveyance, in 1854. She removed from this country to Honduras in 1860, and has resided there ever since. She paid no taxes upon the said land thereafter. It was vacant and abandoned. Lot 925 was sold for non-payment of general annual taxes eight times between January, 1871, and March, 1877, and lot 949 eleven times between August, 1863, and November, 1893, for terms of 1,000 years in every instance, except three terms of 40, 75 and 500 years. Two tax leases were made thereunder of lot 925 for terms of 40 and 500 years, in 1872 and 1878, and two of lot 949 for terms of 75 and 1,000 years, in 1864 and 1873. On December 10, 1894, the defendant (an attorney and counselor at law) wrote to the United States consul at Honduras requesting his services to get from the plaintiff a release to the defendant of her title to the said lots, and another lot at College Point, Long Island, and offering $200 for such conveyance. Upon this letter, and proof that the said two lots are now worth about $2,500 each, the claim of false and fraudulent representations is rested. The letter in so many words made the consul the defendant's representative to negotiate the matter, and promised him a fair compensation for his services. The consul broached the matter to the plaintiff and gave her the letter. The part containing the

alleged false statement is as follows : " The two lots at Mount
Vernon were not very valuable — a hundred or two dollars apiece
in 1860. They have been sold by the State for taxes for many
years subsequent to 1860, and are now occupied by people who
bought same at those sales, which vest the title in the purchasers for
1,000 years. Mrs. St. Laurent is divested of all rights in both par-
cels, and, as an experiment, I am going to bring a series of suits to
try to set these sales aside, hoping the occupants will compromise.
See, also, if she has any old papers relating to this property, and, if
so, secure same. If she be willing to sign the release — and I see no
reason why not, every possible right of hers having been lost — I
would suggest the following course : " here following a method for
the deposit of the deed and payment of the purchase money.
Every statement of fact therein made is substantially true, including
that of the value of the lots in 1860. The statements that the tax
sales vest title in the purchasers for 1,000 years, that the plaintiff
is divested of all rights in the land, and that every possible interest
of hers has been lost, are not of facts, but of legal inferences from
the fact of the sales (the first inference being the basis of and lim-
iting the other two), and fall short of those representations of law
which may be the foundation of a charge of fraud (Bigelow on
Fraud, chap. 1, § 5). But if they should be deemed statements
of fact, they are modified by the statement of the defendant that he
intends to bring suits to try to set aside the tax sales. The defendant
fully discloses that his object in seeking the plaintiff's title is the
speculative one of trying by suits to free his title of the tax sales
and get the occupants out, thus disclosing to the plaintiff that she
may keep her title and do the like herself. The defendant bore
no relation of confidence or trust to the plaintiff, and was, therefore,
not under the obligation to her of disclosure, and even of advice,
which such a relation imposes. They were under the law at arm's
length, and he had only to refrain from deceiving her by false
statements.

But the plaintiff did not make the conveyance in reliance upon
the defendant's statements. She placed his said letter and the whole
matter in charge of an attorney in New York city for investigation
and advice. He conferred with the defendant, considered the tax
sales, and advised the plaintiff by letter that if she desired to bring

suits to set them aside, she would have to pay a retainer, and finally " a considerable sum for professional services." He acted in entire fidelity to her, and she finally concluded not to bring the suits, but to make the conveyance of her title to the Mount Vernon lots to the defendant for $500, and did so, they failing to agree upon a price for the College Point lot. It remains to be said that, as the plaintiff introduced no evidence impeaching the tax sales, they appear to divest the plaintiff of the possession and profits of the land for 1,000 years, and that fact forbids even a suggestion of fraud in the purchase.

Objection was made by the plaintiff to the admission as evidence of the letters of Rohrbach to her, tending to show that this action was instigated and is conducted by the tax lease owners and occupants of the said lots for their benefit, instead of being a genuine and meritorious appeal by the plaintiff to the aid of equity. But it makes no difference whether said letters be deemed in evidence or out.

The rules of evidence of the common-law courts were never adopted or followed in the Court of Chancery. In suits in chancery, errors in the admission or exclusion of evidence never were ground for reversal of the judgment, provided that, disregarding the evidence erroneously admitted, or duly considering the evidence erroneously excluded (which latter, however, could only be done where its extent and force were manifest), the decision was just, and adequately supported by legal evidence. This rule in equity was such a matter of course to bench and bar in preceding generations, that it is quite impossible to find any equity case, except in recent years, where there was any question of it, or any confusion as between it and the stricter rule applied, upon review, to errors in the admission or rejection of evidence in actions in the common-law courts. The only question that arose over it was whether, when an issue of fact was sent out of chancery for trial in a common-law court before a jury, and the verdict and proceedings were certified back to chancery, the errors of the common-law judge in admitting and excluding evidence had to be regarded, upon a motion to set aside the verdict, the same as in the common-law courts, but it was held otherwise, viz., that as the verdict of

the jury was obtained only to inform the conscience of the chancellor, and he was free to adopt or reject it as he saw fit, he reviewed the evidence taken before the jury, in respect of errors in admitting or excluding evidence, in the same way as though it had been taken in chancery (*Barker* v. *Ray*, 2 Russ. 75; *Hampson* v. *Hampson*, 3 Ves. & B. *41; *Steptoe* v. *Pollard*, 30 Gratt. 689; *Powell* v. *Manson*, 22 id. 177; *Forrest* v. *Forrest*, 25 N. Y. 511; *Clapp* v. *Fullerton*, 34 id. 195; *Lansing* v. *Russell*, 2 id. 563). And the same thing is enacted in our Code of Civil Procedure, viz., that when an issue of fact in an equitable action is sent to a jury, "An error in the admission or exclusion of evidence, or in any other ruling or direction of the judge upon the trial, may, in the discretion of the court which reviews it, be disregarded, if that court is of opinion that substantial justice does not require that a new trial should be granted" (§ 1003). The rule in equity causes stated above had never been questioned in this State, and this provision of the Code fully recognizes it by bringing within it trials by a jury of issues of fact in equity suits, in conformity with the foregoing decisions in England and in this country. Surely, it may not be said that the rule survives and applies to equity suits wherein one or more issues of fact are submitted to a jury, but not to equity suits tried entirely by the court. "In equity cases it will be presumed that the trial judge disregarded incompetent or irrelevant testimony, and errors in the admission of such evidence do not afford ground for reversal where there is sufficient testimony to support the decree" (Jones on Ev. § 900; *McSorley* v. *Hughes*, 58 Hun, 360). Law and equity are distinct systems (*Dalton* v. *Vanderveer*, 31 Abb. N. C. 430). That they are now both administered by the same court, under an assimilated system of practice, renders them no less distinct. It is as true now as when each system was administered in a separate court under a separate practice, that evidence which would probably be mischievous with a jury, would have no effect upon the trained mind of a judge.

It is true that in *Foote* v. *Beecher* (78 N. Y. 157) the learned chief judge in his opinion says: "There is no distinction between actions of a legal and those of an equitable nature, in respect to the availability of exceptions taken upon the trial, upon the admission of incompetent evidence, and no reason is perceived for such a dis-

tinction.   Improper evidence may influence a court or referee as well as a jury."   My understanding while at the bar was that this expression was generally deemed not only *obiter*, but also an inadvertence, in view of the Code provision to the contrary cited above, which seems to have been overlooked, as well as of the fact that such a distinction had unquestionably existed from the beginning.   In support of it the opinion cites a sentence from the opinion in *Williams* v. *Fitch* (18 N. Y. 551), a case of reversal for the reception of incompetent evidence, viz., that "the defendant was entitled to the referee's judgment upon the testimony which was competent." But that was a common-law action, viz., for money had and received; and it is not questioned that in such an action, whether a jury be waived or not, the equity rule under consideration has no application.   In a former equity case (*Vermilyea* v. *Palmer*, 52 N. Y. 471) the same learned judge recognized as follows the distinction which he disclaims in *Foote* v. *Beecher*, viz.: "It is quite clear that the court by which the trial is had is not bound to regard exceptions which ought not to affect the merits, and, if so, it is equally clear that this court, reviewing the questions of law upon the trial, must adopt the same rule" (p. 477); and pointed out that that was the rule in chancery.   The case of *Eckerson* v. *Archer* (10 App. Div. 344) is also without application, being an action of ejectment, and is, besides, a case which stands on its own peculiarities.

Judgment for defendant.